# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| NANCY LOUISE CHARBONEAU, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 11-CV-547-PJC |
| | ) |
| MICHAEL J. ASTRUE, Commissioner of the | ) |
| Social Security Administration, | ) |
| | ) |
| Defendant. | ) |

## OPINION AND ORDER

Claimant, Nancy Louise Charboneau ("Charboneau"), pursuant to U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying her application for disability benefits under the Social Security Act, 42 U.S.C. §§ 401 *et seq*. In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge. Any appeal of this order will be directly to the Tenth Circuit Court of Appeals. Charboneau appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that Charboneau was not disabled. For the reasons discussed below, the Court **REVERSES** the Commissioner's decision.

## Claimant's Background

At the time of the June 16, 2010, hearing before the ALJ, Charboneau was 38 years old. (R. 87, 202). She had a tenth grade education, and was licensed as a certified nursing assistant ("CNA"). (R. 203). She worked as a CNA from around 1998 to 2006. (R. 210). Charboneau testified that she injured her back "at the end of June, in probably 2006," and she then took a

week off work. (R. 207-08). On the day she returned to work, she re-injured herself. (R. 208).

Charboneau testified that she was 5'6" tall and weighed 350 pounds. (R. 202-03). She lived with her two children, ages 7 and 16, and her mother. (R. 206). She was able to take care of her own personal needs, such as dressing and bathing. (R. 211). She was able to perform household chores, such as doing laundry, doing dishes, and cooking, with assistance from her children. (R. 211). Her son took care of all of the outdoor chores, such as mowing the lawn and raking leaves. *Id.* Charboneau routinely drove herself and her two children to appointments and ran other local errands, such as going to the grocery store with assistance from her mother. (R. 204, 214). Charboneau qualified these statements by testifying that she could not stand or walk for longer than an hour without having to sit down due to her back pain "drawing up." (R. 212-13). The pain moved from her back down her legs and to her knees. (R. 213). She described her pain as "achy," and stated that her left leg went numb if she was "walking around." *Id.* She could not sit for longer than about two hours due to the same type of lower back pain. (R. 214). When asked by the ALJ to compare standing to walking in terms of pain, she stated that they were "about the same." *Id.* She had no vision, hearing, or breathing problems, but testified that she did have dizzy spells when her "blood pressure was up." (R. 205).

Charboneau sought emergency care at Wagoner Community Hospital on July 15, 2006. (R. 137). She tested positive on a bilateral straight leg raise test. (R. 137). The impressions of the attending physician were morbid obesity and lower back pain with radiculopathy probably from the L4 vertebra. (R. 138). Charboneau was treated with Prednisone and advised to lose weight. *Id.*

On October 5, 2006, Charboneau visited her primary care physician, Chriss B. Roberts, D.O., who diagnosed her with hypertension and morbid obesity and prescribed Adipex.[1] (R. 147). Dr. Roberts noted that Charboneau had been seeing Dr. Frank Shaw for a year and a half to help her lose weight. *Id.* Charboneau was taking HCTZ[2] and potassium as part of Dr. Shaw's treatment. *Id.* She visited Dr. Roberts on November 9 and December 11, 2006, and again on January 8, 2007, in an attempt to get her weight under control. (R. 145-46). Dr. Roberts prescribed Atenolol.[3] (R. 145).

On November 10, 2008, Charboneau returned to Dr. Roberts, complaining of back pain that radiated down her left leg. *Id.* Dr. Roberts ordered lumbar x-rays and at a follow up appointment diagnosed her with degenerative lumbar disease and spondylolisthesis. (R. 144-45). The radiology report indicated "very mild" anterior slippage of her L4 vertebra onto her L5 vertebra. (R. 142). Dr. Roberts prescribed back exercises and ibuprofen or Aleve. (R. 144). Charboneau saw Dr. Roberts again on January 8, 2009, with lower back pain. *Id.* She asked Dr. Roberts if she should file for social security disability, and he encouraged her to do so. *Id.*

Charboneau's next checkup with Dr. Roberts took place on December 14, 2009. (R. 185). Dr. Roberts renewed her Lortab[4] prescription and noted that she was having occasional headaches and dizzy spells and that her lower back pain was steadily increasing. *Id.* Dr. Roberts diagnosed her condition as severe degenerative lumbar disease. *Id.* Charboneau saw Dr. Roberts

---

[1]Adipex is used to facilitate weight reduction. *www.pdr.net*

[2]HCTZ, or hydrochlorothiazide, is used to treat hypertension. *www.pdr.net*

[3]Atenolol is used to treat hypertension. *www.pdr.net*

[4]Lortab is used to treat pain. *www.pdr.net*

again on January 12, 2010, to renew her prescription for Atenolol and to obtain a prescription for Osteo Bi-Flex. *Id.* On June 6, 2010, Dr. Roberts noted that Charboneau's back pain was still increasing and that she likely needed an MRI but was unable to afford it. *Id.* Dr. Roberts noted that Charboneau was "completely disabled at this time due to her lumbar condition." *Id.* On Charboneau's next visit, Dr. Roberts prescribed Tramadol for additional pain management. (R. 188).

Charboneau's next office visit was on August 11, 2010, and Dr. Roberts noted that she had been better able to manage her pain with Tramadol during the day, and a heating pad and ibuprofen at night. *Id.* She was exercising and starting to lose weight. *Id.* Dr. Roberts recommended that she continue taking Lortab, ibuprofen, and Tramadol for pain when necessary, and Adipex to help with weight loss. *Id.* On October 11, 2010, Charboneau returned to Dr. Roberts' office with back pain, along with muscle soreness in her back and thighs. Dr. Roberts noted that she had been working at a farmer's market, and had recently been more active in general. (R. 191). With improved diet and exercise, Charboneau had lost 29 pounds since her last visit. *Id.* Dr. Roberts prescribed Baclofen to treat her muscle tenderness. *Id.* At her visit to Dr. Roberts' office on December 6, 2010, Dr. Roberts noted that Charboneau was upset and having trouble sleeping due to the recent death of her father. *Id.* He prescribed Celexa and Xanax. *Id.*

Dr. Roberts wrote a "To Whom It May Concern" letter dated December 16, 2010, in which he stated that Charboneau suffered from post-traumatic stress disorder after "witnessing her father's fatal tractor accident." (R. 195).

Agency consultant Harold Zane DeLaughter, D.O., completed a physical consultative examination of Charboneau on July 10, 2009. (R. 149-54). Dr. DeLaughter noted that

4

Charboneau was cooperative, intelligible, alert, and oriented. (R. 150). She moved around the room easily, walked at a stable gait, and had full spinal range of motion. *Id.* On her "Backsheet," Dr. DeLaughter indicated that her range of motion of the lumbosacral spine rated 85/90 in flexion, 20/25 in extension, 20/25 in left bend, and 20/25 in right bend. (R. 151). Additionally, he noted that flexion and extension of her lumbosacral spine were accompanied by pain. *Id.* Charboneau's deep tendon reflexes were normal, with the exception of her left knee, which Dr. DeLaughter rated 1/4. *Id.* The rest of her range of motion evaluation was normal. (R. 151-54). Dr. DeLaughter concluded that Charboneau could effectively oppose her thumb to her fingertips, manipulate small objects, and grasp tools. (R. 154).

Dr. Thurma Fiegel, M.D., a non-examining agency medical consultant, completed a Physical Residual Functional Capacity Assessment on July 13, 2009. (R. 155-62). Dr. Fiegel concluded that Charboneau could occasionally lift or carry 20 pounds and frequently lift or carry 10 pounds. (R. 156). She further concluded that Charboneau could stand, walk, or sit with normal breaks for about 6 hours in an 8-hour workday. *Id.* Charboneau could push or pull without limitations other than weight. *Id.* Dr. Fiegel wrote that she based these conclusions on Charboneau's back pain, morbid obesity, manageable high blood pressure, and degenerative lumbar disease, as well as her ability to perform activities of daily living, such as taking care of her children, cooking meals, cleaning, doing laundry, shopping, and driving. *Id.* Dr. Fiegel also concluded that Charboneau had no nerve root compression. *Id.* Based on the same evidence, Dr. Fiegel stated that Charboneau could frequently climb, balance, kneel, crouch, and crawl, and she could occasionally stoop. (R. 157). *Id.* Dr. Fiegel further indicated that no manipulative, visual, communicative, or environmental limitations were established. (R. 158-59).

Agency consultant Dr. Beth Jeffries, Ph.D., completed a psychological consultative examination of Charboneau on September 26, 2009. (R. 164-66). Dr. Jeffries diagnosed Charboneau with a methamphetamine dependence that was in remission. (R. 166). Dr. Jeffries noted that Charboneau reported symptoms of depression and anxiety, but she concluded that her symptoms did not meet the criteria for a major depression disorder. *Id.* Dr. Jeffries further concluded that it was unlikely that Charboneau had any psychological deficits that would impair her ability to perform in an occupational setting. *Id.* She stated that the mild symptoms of depression would likely be resolved with better pain management, as most of Charboneau's complaints dealt with her chronic pain. *Id.*

Dr. Laura Lochner, Ph.D., a non-examining agency consultant, completed a Psychiatric Review Technique form on November 2, 2009. (R. 168-81). Dr. Lochner did not complete most of the form, but in the Consultant's Notes section, Dr . Lochner explained that "further development of the possible mental impairment is curtailed." (R. 168-80). Dr. Lochner noted that Charboneau stated she was depressed, and that she had been diagnosed with methamphetamine dependance in remission. *Id.* However, Dr. Lochner concluded that the evidence indicated that there were "no work-related functional limitations resulting from the possible mental impairment." *Id.*

**Procedural History**

On May 19, 2009, Charboneau filed applications for Title II disability insurance benefits and Title XVI supplemental security income benefits, under the Social Security Act, 42 U.S.C §§ 401 *et seq*. (R. 87-94). Charboneau alleged onset of her disability as December 31, 2006. (R. 87, 91). Charboneau's applications for benefits were denied initially and on reconsideration. (R. 42-49, 52-57). A hearing before ALJ David W. Engel was held on June 16, 2010 in Tulsa,

6

Oklahoma. (R. 198-225). By decision dated July 9, 2010, the ALJ found that Charboneau was not disabled. (R. 14-23). On July 6, 2011, the Appeals Council denied review of the ALJ's findings. (R. 1-6). Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of this appeal. 20 C.F.R. §§ 404.981, 416.1481.

### Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. § 404.1520.[5] *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988) (detailing steps). "If a determination can be made at any of the steps that a claimant is or is not

---

[5] Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510. Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c). If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied. At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings"). A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work. If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform. *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001). Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

disabled, evaluation under a subsequent step is not necessary." *Id.*

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* The court's review is based on the record taken as a whole, and the court will "meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'" *Id., quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994). The court "may neither reweigh the evidence nor substitute" its discretion for that of the Commissioner. *Hamlin,* 365 F.3d at 1214 (quotation omitted).

**Decision of the Administrative Law Judge**

The ALJ found that Charboneau met insured status through September 30, 2011. (R. 17). At Step One, the ALJ found that Charboneau had not engaged in substantial gainful activity since December 31, 2006, her asserted onset date of disability. *Id.* At Step Two, the ALJ found that Charboneau had severe impairments of back disorders and obesity. *Id.* At Step Three, the ALJ found that Charboneau's impairments did not meet the requirements of a Listing. *Id.*

The ALJ determined that Charboneau had the following RFC:

Nancy Louise Charboneau was 35 years of age on the alleged onset date of disability (December 31, 2006) (she is currently 38 years of age with a birthdate of September 5, 1971) with a 10th grade education (1987) and past relevant work as identified by the vocational expert in this case to include that of a certified nurse aide (1998-2006). With respect to lifting, carrying, pushing, and pulling, she is limited to light and sedentary exertion work. With respect to walking or standing, she is limited to 2 hours (combined total) of an 8-hour workday, with regular work breaks. She is able

to sit for 6 hours (combined total) of an 8-hour workday, with regular work breaks. She is able to climb ramps or stairs only occasionally, is able to bend, stoop, crouch, and crawl not more than occasionally, and is unable to climb ropes, ladders, and scaffolds, or work in environments where she would be exposed to unprotected heights, and dangerous moving machinery parts. She is able to understand, remember, and carry out simple to moderately detailed instructions (but no detailed or complex instructions) in a work-related setting, and is able to interact with co-workers and supervisors, under routine supervision. With respect to lifting, carrying, pushing, and pulling, she is limited to light and sedentary exertion work. She is unable to perform tasks requiring overhead reaching more than occasionally and is further unable to perform tasks requiring the use of foot pedals more than occasionally.

(R. 18-19). At Step Four, the ALJ found that Charboneau was unable to perform any past relevant work. (R. 21). At Step Five, the ALJ found that there were jobs in significant numbers in the national economy that Charboneau was capable of performing, considering her age, education, work experience, and RFC. *Id.* Therefore, he found that Charboneau was not disabled.

## Review

On appeal, Charboneau contends that the ALJ did not properly evaluate the medical source evidence, failed to perform a proper credibility determination, and failed to properly consider Charboneau's morbid obesity. The Court agrees with Charboneau that the ALJ did not properly evaluate the opinion evidence of her treating physician, Dr. Roberts. Because this error requires reversal, the other issues Charboneau raises are not addressed.

A treating physician's opinion must be given controlling weight if it is supported by "medically acceptable clinical and laboratory diagnostic techniques," and it is not inconsistent with other substantial evidence in the record. *Hamlin*, 365 F.3d at 1215; *see also* 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2). However, even if the ALJ determines that the treating physician's opinion is not entitled to controlling weight, it is still entitled to deference and must

9

be weighed according to the factors set out in Sections 404.1527(d) and 416.927(d). Those factors are:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Goatcher v. U.S. Dept. Of Health & Human Servs.*, 52 F.3d 288, 290 (10th Cir. 1995). An ALJ may reject a brief, conclusory statement by a treating physician if it is not supported by the medical evidence. *Frey v. Bowen*, 816 F.2d 508, 513 (10th Cir. 1987); *see also Castellano v. Secretary of Health & Human Servs.*, 26 F.3d 1027, 1029 (10th Cir. 1994). However, if the ALJ decides to reject the opinion outright, he must provide "specific, legitimate reasons" for doing so. *Frey*, 816 F.2d at 513.

In his discussion of the medical evidence, the ALJ mentioned Charboneau's June 2010 visit to Dr. Roberts, her treating physician. (R. 20). The ALJ recited that Dr. Roberts stated that Charboneau's pain was getting worse, that she could not stand for very long, and that she was completely disabled. *Id.* The ALJ then gave his only analysis of this treating physician opinion evidence:

> The possibility always exists that a doctor may express an opinion in an effort to assist a patient with whom he or she sympathizes for one reason or another. Another reality which should be mentioned is that patients can be quite insistent and demanding in seeking supportive notes or reports from their physicians, who might provide such a note in order to satisfy their patient's requests and avoid unnecessary doctor/patient tension. While it is difficult to confirm the presence of such motives, they are more likely in situations where the opinion in question departs substantially from the rest of the evidence of record, as in the current case.

(R. 20).

It has long been the rule in this circuit that an ALJ's assertion that a treating physician "naturally advocates" for his patient is not "good cause" to reject treating physician opinions. *Frey*, 816 F.3d at 513-15. Instead the Tenth Circuit in *Frey* in 1987 said that such an assertion was a "conclusory statement that contradicts our established legal rule." *Id.* at 515; *see also King v. Barnhart*, 114 Fed. Appx. 968, 973 (10th Cir. 2004) (boilerplate language asserting opinion was an "act of courtesy" by the treating physician was not a valid reason for rejecting opinion; *Langley v. Barnhart*, 373 F.3d 1116, 11213 (10th Cir. 2004) (same). The boilerplate language used by the ALJ in rejecting the opinion of Dr. Roberts is similar to the language previously disapproved by the Tenth Circuit in multiple cases. The Court finds the language used by the ALJ in addressing the opinion evidence of Dr. Roberts to be inadequate, improper, and conclusory.

"In choosing to reject the treating physician's assessment, an ALJ may not make 'speculative inferences from medical reports' and may reject 'a treating physician's opinion outright only on the basis of contrary medical evidence' and not due to his or her own credibility judgments, speculation or lay opinion." *Morales v. Apfel*, 225 F.3d 310, 317 (10th Cir. 2000) (citations omitted). The ALJ made no attempt to provide any analysis that would support rejection on the basis of contrary medical evidence, other than the conclusory statement that Dr. Roberts' opinion "departs substantially from the rest of the evidence of record." (R. 20). Because the ALJ did not supply the requisite specific reasons for rejecting Dr. Roberts' opinion, there is nothing for this Court to review. *See Langley*, 373 F.3d at 1123 (citation omitted).

The Commissioner in his response brief contends that a finding by a treating physician that a patient is "completely disabled" is an issue reserved to the Commissioner, and is not entitled to any weight in the ALJ's analysis of the medical source evidence. Defendant's

Response Brief, Dkt. #23, p. 5. This was not the rationale upon which the ALJ based his decision to reject Dr. Roberts' opinion. Judicial review of an agency decision is limited to the analysis offered in the ALJ's decision, and it is improper for a reviewing court to offer a "post-hoc rationale" in order to affirm. *Carpenter v. Astrue*, 537 F.3d 1264, 1267 (10th Cir. 2008).

This court takes no position on the merits of Charboneau's disability claim, and "[no] particular result" is ordered on remand. *Thompson v. Sullivan*, 987 F.2d 1482, 1492-93 (10th Cir. 1993).

## Conclusion

Based upon the foregoing, the Court **REVERSES AND REMANDS** the decision of the Commissioner denying disability benefits to Claimant for further proceedings consistent with this Order.

Dated this 26th day of October 2012.

_____
Paul J. Cleary
United States Magistrate Judge